THE PEOPLE *ex rel.* Robert Scholes, State's Attorney,

*v.*

ARTHUR KEITHLEY.

*Opinion filed December 22, 1906—Rehearing denied Feb. 6, 1907.*

1. ATTORNEYS AT LAW—*attorney should not represent both parties to suit.* An attorney should not, after filing a bill to remove a cloud from title, accept a retainer from the defendant and undertake to protect his interests against the complainant's adverse claims; and the fact that the attorney was young and inexperienced at the time is no extenuation of the offense in a subsequent disbarment proceeding, where the attorney, after years of experience in practice, claims that such conduct was proper.

2. SAME—*an attorney owes a duty to his profession as well as to his client.* An attorney owes a duty to his profession as well as to his client, and the fact that his client does not complain of the attorney's double dealing, whereby he keeps for his own use and benefit a note and mortgage intended to settle claims against the client, which the attorney, without the client's knowledge, compromises for a little over half of the amount of the note and mortgage, does not excuse his unprofessional conduct.

3. SAME—*when an attorney should be disbarred.* An attorney should be disbarred who by overreaching methods and grave unprofessional conduct induces a client, in whose favor he has obtained a judgment against an insurance company for a large amount, to make a settlement with him whereby he secures the greater part of the amount of the judgment for himself, thereby making an unreasonable and unconscionable profit with a corresponding loss to his client.

INFORMATION to disbar.

W. H. STEAD, Attorney General, ROBERT SCHOLES, State's Attorney, STEVENS & HORTON, F. H. TICHENOR, and JOSEPH A. WEIL, for petitioners:

Whenever an attorney is so wanting in professional and personal fairness and integrity as to render him unworthy of public confidence and unsafe and unfit to be entrusted with the powers and duties of an attorney his name will be stricken from the rolls. The Statute of Limitations has no

application to such delinquencies of an attorney. *People* v. *Hooper,* 218 Ill. 313; 4 Cyc. 915.

An information to strike an attorney from the rolls for misconduct in office is a civil procedure, and not a prosecution which must, under the constitution, be carried on in the name of the People. *People* v. *Moutray,* 166 Ill. 630.

For every willful breach of professional obligation on the part of an attorney the court has the right to strike the name of such attorney from the rolls. *People* v. *Barker,* 56 Ill. 299.

Where an attorney seems to have no just appreciation of the relation of trust and confidence that the law intends shall exist between client and attorney, nor of that faithfulness and fidelity to his client which the law exacts from an attorney, it is the duty of the court to strike his name from the rolls. *People* v. *Frisch,* 218 Ill. 285.

The charges against an attorney must be established by clear and satisfactory evidence and the trial must be upon the charges in the information, and other charges will not be considered for disbarment unless the charges stated in the information are proved. *People* v. *Matthews,* 217 Ill. 94; Starr & Cur. Stat. chap. 13, sec. 8.

The law requires of an attorney the utmost fidelity toward all who may employ him. Not only is the attorney precluded from taking advantage of his superior knowledge and skill to the detriment of the client, but in all controversies between them the burden is on him to show that he truthfully informed his client as to all the facts and his rights in the premises. *Hill* v. *Montgomery,* 84 Ill. App. 300.

An attorney who bargains in a matter of advantage to himself with a client is bound to show the transaction is fair and equitable, that he fully and faithfully discharged his duty to his client, without misrepresentation or concealment of the facts material to his client, and that his client was fully informed of his rights and interest in the subject matter of the transaction. *Faris* v. *Briscoe,* 78 Ill. App. 242.

The concealment of facts by an attorney, by which means he obtains the subject matter of the litigation in which he had been retained, has the same effect as a misrepresentation to vitiate the transaction. *Sutherland* v. *Reeve,* 151 Ill. 384.

The court will,. on general principles of policy and equity, look into the dealings between an attorney and client, and guards the latter because they do not stand upon equal terms. *Gruby* v. *Smith,* 13 Ill. App. 43.

The law looks scrupulously into all contracts between an attorney and his client, but it does not prohibit them nor hold them to be void *ab origine.* *Rolfe* v. *Rich,* 149 Ill. 436.

WINSLOW EVANS, F. J. QUINN, and JAMES A. CAMERON, for respondent:

The offense for which disbarment is sought must be established by evidence which is clear and positive and free from reasonable doubt. *People* v. *Matthews,* 217 Ill. .94; *People* v. *Harvey,* 41 id. 277; *People* v. *Barker,* 56 id. 299.

This measure of proof is required not merely in cases charging felonies or misdemeanors, but to support any charge sufficient for disbarment. *People* v. *Matthews,* 217 Ill. 94; *People* v. *Harvey,* 41 id. 277; *People* v. *Barker,* 56 id. 299.

The respondent can be tried only on the matters specifically charged in the information. *People* v. *Matthews,* 217 Ill. 94; *People* v̇. *Allison,* 68 id. 151.

The charges and accusations must be clear and specific, giving time, place and acts of misconduct with reasonable certainty, that the attorney may know how to defend. General and vague charges are not sufficient. A charge so grave in its nature and possibly leading to such serious results must be stated with great particularity. 204 Ill. 23, rule 40; *People* v. *Allison,* 68 Ill. 151; Weeks on Attorneys, 156.

The law does not prohibit dealings between attorney and client or declare all contracts made by an attorney with a client *ipso facto* void or voidable at the instance of the client. And where the acts or contract are merely. voidable at the

instance of the client, no duty arises requiring the attorney to restore or refund what he may have received under such contract until the client has asked to have it rescinded. *Rolfe* v. *Rich,* 149 Ill. 436; *Morrison* v. *Smith,* 130 id. 304; *Herr* v. *Payson,* 157 id. 244; *Elmore* v. *Johnson,* 143 id. 513.

While it is true that a lawyer, in dealing with his client concerning the subject matter of litigation, is held to the strictest account as to fair dealing and good faith, yet he is not prohibited by law from dealing with his client and purchasing or agreeing to purchase the client's property. There are many cases in which, if the lawyer does not help the client by buying or agreeing to buy the client's property, the client will be ruined. To preclude the client from being aided by the lawyer would often preclude the client from being aided at all. Weeks on Attorneys, 464.

Sometimes, in chancery suits, the same solicitor may be concerned for several parties, some of whom may be plaintiffs and some defendants upon the record. Weeks on Attorneys, 455.

An attorney should not be disbarred on the charge of an indictable offense until after he had been duly indicted, tried by a jury and convicted. Weeks on Attorneys, 156-158.

A wrongful act and a bad motive, involving turpitude in its commission, must be clearly established to justify disbarment. *State* v. *Finley,* 18 L. R. A. 401.

Mr. JUSTICE VICKERS delivered the opinion of the court:

This is a proceeding to disbar Arthur Keithley, who was licensed to practice by this court in 1883. The information presented by the State's attorney of Peoria county charges respondent with illegal, immoral and unprofessional conduct in connection with a number of transactions, or a series of transactions, with different clients. These several charges of misconduct are designated by the commissioner to whom this case was referred, in his report, and by the counsel, as "cases," distinguishing them by the name of the party con-

225—3

cerned, although, strictly speaking, they were not all cases in court but some of them relate to business transactions outside of court. These several so-called cases, as set out in the information and as treated in the record, are designated as (1) the Heaton case; (2) the Eckhardt case; (3) the Wood case; (4) the Watson case; (5) the Foster case; (6) the Donmeyer case; (7) the Allen case; (8) the Peoria Star case. Included under the Peoria Star case are the Reyburn and Rogers cases. Each of these cases is the subject of a separate charge or count in the information, which purports to give a history of a particular lawsuit or business transaction, setting out the part alleged to have been taken by respondent therein as an attorney, from which the conclusion is sought to be drawn that respondent was guilty of dishonesty in his profession, of being a man of such insatiate greed in his dealings that all sense of justice and honor was overridden or destroyed, and that he has been guilty of such unprofessional conduct in each case as to bring reproach on the legal profession. Each charge has been answered by the respondent, and the issues thereby made were referred to a commissioner, in accordance with the practice of this court, to take the testimony and report his conclusions both as to the law and fact. The commissioner has taken all the testimony and reported his findings, which are in favor of respondent as to the Heaton case, the Wood case and the Foster case, and against the respondent in all others. Respondent has filed exceptions to all the findings of the commissioner which were against him, which have been overruled. While no exceptions have been filed by relators to the adverse findings of the commissioner, we have nevertheless considered these cases, and our conclusions being in accord with those of the commissioner we will not obtrude a discussion of them in this opinion. Each case is based on its own facts and has no special connection with the others, and hence it will be necessary to treat them accordingly.

(1) *The Eckhardt case*—In 1881 John Eckhardt executed a note for $1050 to Sophia Ditewig, which was secured by a trust deed to John M. Herget on certain real estate in the city of Peoria. In 1882 John Eckhardt sold a part of the real estate included in the trust deed to John M. Herget for $1600. Herget paid $550 in cash and afterwards took up the $1050 note of Sophia Ditewig in accordance with his agreement. The trust deed was not released of record except as to a part of the premises, nor was the note surrendered to Eckhardt, although the debt was paid. In 1884 John Eckhardt was indicted, tried and convicted for grand larceny and sentenced to the penitentiary. Keithley was one of Eckhardt's attorneys in the larceny case. Before entering on his term of imprisonment John Eckhardt made a voluntary conveyance of all the real estate he owned to his son William, who afterwards conveyed one-third each to his two sisters. William filed a bill to the May term, 1884, to compel the release of the trust deed as a cloud upon the title to the real estate which he had received from his father. A decree was entered in February, 1885, in accordance with the prayer of the bill. This bill was based on the ground that the note given to Sophia Ditewig had been paid. Keithley was an attorney for Herget in the case. In pursuance of the order of the court Herget did release and cancel the trust deed on February 14, 1885, but did not, it seems, surrender the note to the Eckhardts. This note had been paid in full and the payee surrendered it to Herget, who paid the note as a part of the consideration for the lots that had been conveyed to him by Eckhardt, and the fact that it had been paid had been made to appear in the case of Eckhardt against Herget, wherein respondent was a solicitor for defendant, Herget.

In the year 1885 another party comes into view. Minnie Gebhardt had some trouble with Herget. She sued him in some action at law involving fraud. Herget was arrested on a *capias ad satisfaciendum* and put in jail. He then per-

petrated another fraud to get out of jail for the first.   He wrote on the back of the Eckhardt note, "Amount due May 14, 1884, five hundred sixty-one dollars and seventy-five cents, ($561.75)," and succeeded in inducing Minnie Gebhardt to accept it as security for her claim and he was released from custody.   Minnie Gebhardt sued John Eckhardt for the balance which appeared to be due on the said note. Under advice of Herget, Eckhardt made no defense, and judgment went against him by default for $650 in October, 1886.   These several transactions are only important as leading up to what is to follow and as showing a knowledge of respondent of the various facts which have a bearing on his subsequent action.   In 1891 respondent went to Minnie Gebhardt and the following is her version of what occurred : "He (respondent) came to me and asked me if I wanted the money John Herget had swindled me out of, and I said, 'Yes, I want it.'   He said I should give him $10 and he would get it for me.   I gave him $10.   Afterwards he wrote me a letter and I went to his office and gave him $10 more. I did not know him—had never seen him before."   Respondent admits the above statement to be true in substance.   Respondent filed a creditor's bill for Minnie Gebhardt against the Eckhardts to set aside the deed made by John to William in 1884.   After service of summons on John Eckhardt respondent claims he was employed by John Eckhardt to get his title back from his son and daughters.   Respondent claims that he was employed and paid by John Eckhardt to represent the said Eckhardt in the case respondent then had pending for Minnie Gebhardt against him and the other members of the Eckhardt family.   In other words, respondent received a fee from both the complainant and defendant and filed an answer for John Eckhardt confessing the bill of Minnie Gebhardt.   He also filed a cross-bill for John Eckhardt asking some relief against the other parties in the case. At the May term, 1891, W. T. Whiting, an attorney who had been employed by John Eckhardt to defend the Geb-

hardt suit came into court, and finding the answer and cross-bill of John Eckhardt on file moved the court to strike them from the files.   Respondent objected, and a controversy took place as to whom Eckhardt had empowered to represent him. The court sent for John Eckhardt, had him sworn and asked him who his lawyer was in that case, and he replied that he had employed Mr. Whiting.   Thereupon the motion to strike the answer and cross-bill was sustained.   The answer and cross-bill were withdrawn from the files by respondent and have not been introduced in this case.   Mr. Whiting put in an answer, setting up, among other things, that the note upon which the alleged judgment of complainant was based had been fully paid and discharged.   The court, upon a hearing, dismissed the Gebhardt bill.

Respondent, both in his answer to the information and his testimony given in support thereof, gives an account of his connection with the Eckhardt case which is in conflict with the testimony given by him on the hearing of the Gebhardt-Eckhardt case.   In the latter case respondent testifies that Eckhardt came to him and employed him to get his land back, and he advised him that the way to do it was to let Mrs. Gebhardt file a bill to set aside the conveyance as a creditor and that Eckhardt could then file a cross-bill and set up his interests.   He leaves the impression by his testimony that Eckhardt was his original client and that the Gebhardt creditor's bill was only a means to be adopted to serve Eckhardt's interests.   Respondent's position before the commissioner and in his answer is that he went to Mrs. Gebhardt first and had filed her bill, and he says it was after Eckhardt had been served with a summons that Eckhardt came to him and asked him if he could not represent him also in the case, and that respondent told him he could, and that then he filed the answer and cross-bill for Eckhardt.   It is not material here to determine which of the two accounts is the true one, since by both of them respondent puts himself on both sides of the lawsuit, and by so doing his position

is wholly inconsistent, and no explanation has been offered which in reason, law or morals tends to palliate or excuse such a grave breach of professional propriety. Respondent admits this charge in effect, and seeks to justify himself on the pretense that the interests of the complainant and the defendant were not antagonistic. This explanation discredits respondent's knowledge of the law or his comprehension of the facts, although he enjoyed the unusual advantage of viewing the case from both sides. Respondent was then a young practitioner, and his youth and inexperience might have been invoked in extenuation of his offense were it not for the brazen manner in which now, after a varied experience in the practice of law extending over a score of years, he seeks to justify his course. Errors and indiscretions born of an impetuous and enthusiastic young manhood may be mantled by charity and forgiven, but when mature manhood is ushered in and the sobering influence of ripe experience has exhausted its power, the lawyer who still clings to and defends his early wrongs, thereby ratifying and approving the same, is not entitled to any extenuation on account of inexperience or the length of time that has elapsed since the offense.

How respondent can reconcile his claim that the interests of complainant and defendant in this suit were not antagonistic with the conceded fact that he has a fair knowledge of the law we are at a loss to see. If complainant succeeded, the decree would simply establish her claim and order it paid, and in default the land would be sold to pay the claim, and order that the deed from John Eckhardt to William be set aside *as to the complainant* in the creditor's bill, leaving the title as to the parties and all other persons where it was before. If the land went to sale and there was a surplus it would belong to William Eckhardt, as between him and his father. This is the rule of law now, and we have been unable to find a single case to the contrary. By the very terms of the statute 13 Eliz. chap. 5, from which is derived

most of the law on this subject, it was provided that "all conveyances, etc., of any lands, goods or chattels, had or made of purpose to delay or defraud creditors or others of their actions or debts, shall be taken, *only as against such persons and their representatives as shall or might be so delayed or defrauded, to be utterly void.*" The decree setting aside a fraudulent conveyance should merely declare the conveyance void as to the complaining creditor, and should not set it aside as between the parties. (5 Ency. of Pl. & Pr. p. 599, and cases cited.) This rule has often been declared in this State. (*Miller* v. *Marckle,* 21 Ill. 151; *Campbell* v. *Whitson,* 68 id. 240; *Jolly* v. *Graham,* 222 id. 550; *Jones* v. *Jones,* 213 id. 228.) In the *Campbell case* it was said: "A conveyance of this sort (it has been said with great truth and force) is void only as against creditors, and then only to the extent in which it may be necessary to deal with the conveyed estate for their satisfaction. To this extent, and to this only, it is treated as if it had not been made. To every other purpose it is good. Satisfy the creditors and the conveyance stands." This language is quoted and approved in *Grosse* v. *Sweet & Co.* 188 Ill. 555.

(2) *The Watson case*—Hiram Watson purchased a lot from respondent which he mortgaged to the People's Loan and Homestead Association for money with which to build a house, giving respondent a second mortgage to secure a balance of unpaid purchase money. Watson contracted two debts, aggregating $450, for building materials which went into the house. Suits were commenced by the creditors to have a lien established on the property and respondent was employed by Watson to represent him in this case. Respondent attempted to effect a settlement, and it appears that he made a tentative agreement with Ross, one of the attorneys for the creditors, to the effect that they should take Watson's note for $450 and a third mortgage on the premises to secure it. Respondent procured the execution of the note by Watson, making it payable to George T. Page,

another member of the firm of attorneys who had the lien suits in charge. The mortgage to secure said note was made by Watson and wife, and it was to Samuel D. Wead, another lawyer in the same firm. When Mr. Page was informed of the proposed settlement he refused to accept it and demanded payment in money, and it was finally arranged that a settlement of the $450 should be made for $225 in cash, which respondent paid out of his own funds and then recorded the mortgage for $450 and said nothing to Watson about it. Respondent held the note and mortgage, and when the first year's interest was due Watson went to his creditors and wanted to work for them to pay the interest. He was then informed for the first time that he did not owe them anything and that their claim had been settled. Watson then called on respondent and paid the interest on $450, and the second year he did likewise. It is true, Watson testifies that respondent told him when he paid the amount respondent had been out on the matter respondent would release the mortgage. Respondent's attitude in this case is shown by the following questions and answers before the commissioner:

Q. "Mr. Keithley, after you had taken this note of $450, secured by a deed of trust on this man's property, payable to the order of George T. Page or Page & Wead, and you found they would not accept it, why did you not then destroy it and draw up new papers instead of letting this thing run on in the name of George T. Page for two years?

A. "I am perfectly satisfied with it standing as it is, and you ought to be.

Q. "Have you any further explanation of that?

A. "None whatever. Mr. Watson has promised me to take it up and I am satisfied he will. If he doesn't, I am satisfied I will foreclose it."

While we are not prepared to say that respondent's conduct in this case is dishonest, yet he is certainly guilty of exceeding his authority, in the first place, by making a set-

tlement of his client's case without his knowledge or consent and of neglectful indifference in failing to inform him for so long a time of what he had done.   In this case much stress is laid on the fact that Watson is satisfied.   This is all well enough.   It is, and ought to be, a laudable ambition of every lawyer to win the approval of his clients; but it does not necessarily follow that when he has secured that, he has established a claim to immunity from just censure.   In the first place, the client may be himself a rascal, crook or criminal, who would readily approve anything, however infamous, that his lawyer might do if it helped him.   And again, if he is honest he may be poor, helpless and dependent, and be influenced to approve because he feels that he cannot afford to disapprove what his attorney has done.   A lawyer who adopts as his standard of professional conduct a rule making the approval of his client the only test, disregarding everything else, has no standard at all, and will find himself constantly hedged about with humiliating embarrassments and inexplicable difficulties.   The lawyer owes a duty to the honorable profession of which he is a member, and in the language of this court in *People ex rel.* v. *Ford,* 54 Ill. 520, "he should guard with jealous watchfulness his own reputation as well as that of his profession."

(3) *The Donmeyer case*—Isaac W. Donmeyer placed a claim in the hands of respondent for $5000 for collection against C. C. Magenheimer.   Magenheimer being unable to pay the claim, respondent made a settlement, taking four notes, the first being for $500 and all interest due, and three others aggregating $4500.   The last three notes were signed by C. C. and G. D. Magenheimer and J. D. Ryan, and were secured by a second mortgage on five hundred acres of real estate in Clay county worth $20,000 to $25,000.   The first mortgage was for $9000.   In making this settlement respondent took the mortgage in his own name.   Donmeyer repeatedly urged respondent to proceed to collect these notes.   The first note was paid and the proceeds turned over to Don-

meyer. The remaining $4500 was not paid at maturity. Finally respondent bought the notes for $3250 and collected the full amount in cash and securities. Donmeyer testified that respondent pretended that he had a client who would buy the notes, and that he never supposed respondent was buying them for himself. In this respondent contradicts Donmeyer, and if their evidence is to be regarded with equal credibility, there is not that clear and satisfactory preponderance of evidence that ought to exist before a judgment disbarring an attorney should be pronounced. While, as between attorney and client, this transaction could no doubt be and ought to be set aside, still if it stood alone we would hesitate to rest a judgment disbarring respondent under the evidence on this charge.

(4) *The Peoria Star case*—The Peoria Star Company is a corporation engaged in the publication of a newspaper called the "Peoria Star." Respondent is charged with unprofessional conduct in respect to several different matters which directly or indirectly concern the Peoria Star Company or the officers thereof. We have given these several matters careful consideration, but have concluded not to discuss them. We are influenced to take this course by the following considerations: (1) Our views on this case would not have any effect on the ultimate conclusion to be announced as the result of the whole case. (2) It appears that there is a personal controversy existing between respondent and the Peoria Star Company and its officers and managers. It is very intense and bitter. In fact, it resembles a war of extermination. Growing out of this controversy divers suits have been brought, both criminal and civil, some of which are still pending and undetermined in the circuit court of Peoria county, and any discussion of these charges herein might prejudice the trial of these cases. In view of these considerations the Peoria Star case will not be discussed.

(5) *The Allen case*—In this case respondent is charged with unprofessional conduct and a violation of his duty to

his client, Mrs. Kate M. Allen, and also of a violation of the law, as set out at length in certain affidavits in the information, one of the chief matters being, that he induced Mrs. Allen, by misrepresentation and fraud, to make a settlement with respondent of a judgment in her favor which he controlled and in which he had an interest, under a contract with her while he was acting as her attorney.

The evidence in this case shows that on October 1, 1901, Joseph H. Allen, the husband of Kate M. Allen, procured a policy on his life in the Mutual Life Insurance Company of New York for $20,000 through Joseph Clark, an agent of the said company. Joseph H. Allen died in May, 1902. Through information received from Clark, the respondent learned of the existence of the policy and the death of the assured. Respondent requested Clark to put him in communication with Mrs. Allen with a view of becoming her attorney to collect the insurance policy. The company disputed its liability under said policy on several grounds. At respondent's request a young man by the name of Joseph F. Gunn, who was engaged to be married to Mrs. Allen's daughter, brought Mrs. Allen to respondent's office. Mr. Gunn had previously spoken to another lawyer in regard to Mrs. Allen's claim, but this fact was not disclosed to respondent before Mrs. Allen came to his office. Respondent also told Mr. Gunn that he would pay all the expense of the litigation, and in order to relieve Mrs. Allen from want he would lend her some money upon the outcome of the suit. When Mrs. Allen, her daughter and Mr. Gunn came to respondent's office in Peoria, Mrs. Allen, feeling under some obligations to the other attorney to whom Mr. Gunn had spoken, was inclined to go to him, but was finally persuaded through respondent's offer to loan her money on the case, and some disparaging remarks by respondent concerning the other attorney, to employ respondent to prosecute the case. After the case was placed in his hands respondent let Mrs. Allen have $100, and took from her an assignment of

all right, title and interest in the $20,000 policy, and in addition took a note from her signed by herself and Mr. Gunn. Suit was brought on the policy in the name of Mrs. Kate M. Allen, for the use of Arthur Keithley, against the Mutual Life Insurance Company of New York. The trial in the circuit court resulted in a judgment in favor of the plaintiff. An appeal was prosecuted to the Appellate Court for the Second District, where the judgment was affirmed, (*Mutual Life Ins. Co.* v. *Allen,* 113 Ill. App. 89,) and upon further appeal the judgment was affirmed by this court. (See 212 Ill. 134.)

After the verdict had been obtained for Mrs. Allen in the circuit court she made a written proposition to respondent that if he would advance her $50 per month until the case should be settled one way or the other, and pay her, in the event of a favorable termination of the suit, $10,000, she would assign the policy to him absolutely. This proposition contemplated that Mrs. Allen should receive $10,000 net, in, over and above all sums that might be advanced to her before the final termination of the suit. Up to this time there had been no fixed agreement between respondent and his client respecting his compensation, beyond the general understanding that he was to receive a contingent fee out of the money to be collected. Afterwards a written contract was entered into between them which embodied the substance of Mrs. Allen's proposition, except that all money advanced by respondent was to be deducted from the $10,000 which Mrs. Allen was to receive. Manifestly, Mrs. Allen always understood that she was to have $10,000 net, over and above any money advanced her by respondent, while the contract which she signed did not so provide. Respondent advanced $50 per month, and paid out other sums for costs, expenses and printing, etc., aggregating about $1600. On October 26 respondent received information that the judgment had been affirmed in this court, and thereupon he wrote Mrs. Allen a letter advising her of the affirmance of the judgment and

asking her how much he owed her under the contract.   On
the same day Mrs. Allen replied to the letter, saying, "You
owe me $10,000 according to the contract."   Before receiv-
ing her reply, however, respondent took the train and went
to St. Louis, to which place Mrs. Allen had removed.   He
went to Mrs. Allen's house on the morning of October 28,
and the occurrences that there took place, as detailed by
Mrs. Allen, are as follows:

"He came to our house in the early morning, and, as I
say, very early, for I had hardly gotten my work done, and
the first thing he said to me was, 'Well, Mrs. Allen, you have
won out.' I said 'Yes.' 'Did you receive my letter?' 'Yes,
sir.' 'What was your reply in regard to your understanding
of the contract?' I said, 'Well, Mr. Keithley, my reply has
gone.' He says, 'Did you answer?' and I says, 'Yes, it's
gone.' 'What did you say?' 'Well, I said I expected $10,-
000 out of it.' He said, 'Well, you won't get it, because
that wasn't in the contract; get the contract,' and I hesi-
tated. 'Go get the contract,' he says, 'and let me see it,'
and I went and got the contract and brought it out and he
read it, and he says, 'See here, that isn't in the contract, is
it, that you are to get $10,000? You are to get $10,000 less
what I have advanced you. Now, I will tell you what I will
do. I will give you $8000. I will pay some of your debts
that you say you have to pay. But shucks,' he says, 'now
there's that rehearing staring us in the face; but never mind,
I will take the risk. I will give you $8000 for your share.'
I says, 'Mr. Keithley, I couldn't stand $8000; I couldn't
live on it.' 'You take it and let me invest it for you.' I
says, 'Mr. Keithley, what you would give me wouldn't keep
me in shoe leather;' and so then he says, 'Now, I'll tell you,
the insurance company are going to ask for a rehearing, and
they will get it and you will be out, because I had a case
once that was decided in my favor in all three courts, and
the other side asked for a rehearing and they got it and I lost
out.' He says, 'Now, will you take $8000?—and you have

notes out.' Says I, 'Mr. Keithley, I never signed a note in my life.' 'Well, that doesn't make any difference; they are out in your name; you have debts; your husband has debts; there's physicians' bills and grocery bills and hotel bills; and there's the Leland Hotel; they have been after me in Springfield; you will have all that to pay; if you take $8000 you can take it and put it away in someone else's name and you will be free from these debts; there will be garnishments and attachments.' And I says, 'Mr. Keithley, I do not know what to do, but will wait until Mr. Gunn gets home to-night and consult with him, although I do not believe he will have anything to say, but I will not do anything till he comes.' So Mr. Keithley very reluctantly left; and in the evening he was there on time. He came about eight o'clock. I was in a terrible state of health,—nervous over my daughter's illness, nervous over my financial estate, and a physical wreck. Mr. Keithley spoke in a dictatorial way— not in a cross way but in that dictatorial way that Mr. Keithley generally has. When Mr. Gunn came into the room in the evening Mr. Keithley turned to me and says, 'Have you told Mr. Gunn what I said?' I said, 'Well, I hardly think Mr. Gunn will have anything to say about it, Mr. Keithley, because in the insurance case they accused him of marrying my daughter for the money, and he hesitates.' 'Have you told him what I said about the money?' I turned to Mr. Gunn and said, 'Mr. Gunn, Mr. Keithley says he will give me $8000 for my part of that claim.' He says, 'I have changed my mind since this morning; I won't give you but $7500; I wouldn't take that risk for anybody under $500.' 'Why, Mr. Keithley,' I says, 'what will $7500 do for me?' 'It's that or nothing.' He turned to Mr. Gunn and he said, 'I told Mrs. Allen about the two cases that were decided against me, and I have told her about these debts that were hanging over her, and told her about these notes.' And I said to Mr. Keithley, 'Did you see the notes?' 'No, but I know they exist,' and he talked in the same strain that he

did in the morning to me, and asked me, 'Well, what are you going to do?' I said, 'Well, Mr. Keithley, what am I to do? There is no alternative. If this money will be attached and all these bills are out against us I had better take that than nothing, and as there is no other alternative I guess I will take it.' "

The above statement is corroborated by Mr. Gunn as to the occurrences in the evening and is only contradicted by respondent as to the details. Respondent there gave Mrs. Allen two checks, one for $2000 and another for $5514. On the 14th of November respondent received the amount of the judgment, advanced costs and interest, aggregating $22,686.37. He had paid out for costs, sums advanced to Mrs. Allen and amount paid on settlement, $9114, leaving a net amount received by respondent of $13,572.37, out of which he was to pay three small claims aggregating $386. He paid out on these claims $290.50, leaving a net amount received by him of $13,281.87. In the settlement Mrs. Allen had left with him $386, with which she expected him to pay three bills. Respondent reported to her that he had paid the bills, aggregating $410.07, and sent receipts to her from the claimants. In point of fact he had compromised and settled the claims for $290.50, thereby making a profit of $95.50 in the settlement of these three small claims. The only explanation of this matter given by respondent is, that he had an agreement with some of these claimants to collect their claims for a per cent, and that he deducted his fees. Upon learning that the judgment had been paid in full to respondent, Mrs. Allen went to Peoria and employed other attorneys to try to collect from respondent some of the money which he had retained out of this judgment. These attorneys interviewed respondent, and as a result respondent paid them $4000 more for Mrs. Allen.

The facts in this case present a record of overreaching which, to our minds, is utterly incompatible with that spirit of honesty, truth and fairness that should characterize the

dealings of a conscientious lawyer with his client. Respondent's first step in this case was to place Mrs. Allen under financial obligations to him and take an assignment of the policy. Evidently he foresaw the advantages of this movement. He would control the cause of action and thus prevent the possibility of a settlement of the claim, should the company desire to do so, without his concurrence, and at the same time prevent the possibility of Mrs. Allen relieving her pressing necessities by hypothecating the claim to any one else who might be willing to loan her money on the outcome of her suit. This advantage respondent assiduously followed up, using the distressed and impoverished circumstances of his client as a pretext to strengthen his grasp on her cause of action. Finally, when the supreme moment arrived for the last act in this scheme that was to forever release all claim of Mrs. Allen to this large sum of money, it was found that the preparatory work had been well done, and it only required a little supplementary manipulation to consummate his purpose. Mrs. Allen dared not procrastinate or postpone. She had asked for a respite in the morning until she could confer with her son-in-law in the evening, and respondent took off $500 from his offer. Well might she reason, If I do not accept now, to-morrow may see the proposition withdrawn or another $500 pared off. Then the danger of a rehearing, the possibility of attachments and garnishments, were held up before her, and she was told she would better accept the offer than get nothing at all. It is not unreasonable to believe Mrs. Allen even thought of the possibility that if respondent was not settled with on his own terms he might himself finally seek to reduce her interest by getting control of the claims against her. That respondent was in communication with certain of her creditors is admitted, and one claim he had at least for collection on a basis of twenty-five per cent commission. Is it any wonder Mrs. Allen settled for so small a sum? Respondent had cut off every avenue of escape, and so sure was he of his prize that he seems to have

gone to St. Louis prepared with checks to pay her. If this settlement was honest and fair, why did respondent so readily turn over, without contest more serious than a single interview, $4000? The excuse that is put forward for this is the fact that he had overlooked a certain clause attached to the policy which would have entitled Mrs. Allen to $6100 more had it been seen by respondent in time. If respondent felt that through his neglect he had failed to claim all that was due under the policy and that he ought to treat that as collected which by proper attention and diligence on his part would have been collected, why did he not bring this to Mrs. Allen's attention and include it in the St. Louis settlement? He must have known of this condition long before that time, since a copy of the policy was attached to a deposition taken in New York before the trial. His failure, he says, to include it in the suit was an oversight. He failed to include it in the settlement at St. Louis. It is our conviction that the real reason why respondent paid this additional $4000 was to prevent an exposure, and, if possible, silence Mrs. Allen.

With a full appreciation of the serious consequences of depriving respondent of the future enjoyment of the honors and emoluments of a professional knowledge which has doubtless cost him years of patient study to acquire, we have gone through this long record. We have carefully weighed and considered every fact that has been presented in explanation of the charges made. After giving his case our serious and most patient attention, we feel constrained to find that respondent is guilty, in the Eckhardt case, of accepting a fee from both parties in a matter where their interests were antagonistic; that he is guilty, in the Watson case, of wrongfully and carelessly withholding from his client the true status of his interests in his hands, and of accepting interest on $450 when in no event was he entitled to more than the interest on $225; that in the Allen case respondent is guilty of grave unprofessional conduct which was employed to induce a settlement by which respondent made an

225—5

unreasonable and unconscionable profit by a corresponding loss to his client.; that there is, pervading all these transactions, unmistakable evidence that respondent is a man with whom the love of gain is a ruling passion. Under the domination of this relentless power respondent has stifled conscience, outraged justice, disgraced himself and brought a reproach upon the legal profession. In conclusion, there is therefore only one course for this court to pursue, and that is to prevent a repetition of these and like offenses, if possible, by striking the name of respondent from the roll of attorneys of this court, which is accordingly done.

*Rule made absolute.*