(No. 37600.—

*In re* George C. Thompson, Attorney, Respondent.

*Opinion filed November 26, 1963.—Rehearing denied May 19, 1964.*

J. R. CHRISTIANSON, of Chicago, *amicus curiae*.

DOM J. RIZZI, of Chicago, for respondent.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

The committee on grievances of the Chicago Bar Association, acting as commissioners of this court under Rule 59, has filed a report recommending that the respondent, George C. Thompson, be disbarred. The respondent has filed exceptions to the commissioners' report.

The complaint against the respondent contained five counts, all of which charged substantially similar acts. In count I, it was alleged that the respondent entered into an oral agreement with the law firm of Director & Liebenson, wherein the respondent agreed to refer certain personal injury cases, in which respondent had been retained by the injured persons, to said firm for disposition by settlement or trial, and the firm agreed to advance money to respondent to cover the investigation expenses in such cases. It was alleged that on seven different occasions the respondent repre-

sented to these attorneys that he had been retained by certain railroad employees who had suffered injuries in railroad accidents and that on each of these occasions the attorneys advanced money to the respondent in exchange for which the respondent agreed that the attorneys were to share in the fee. It was charged that in each of these instances the cases referred by the respondent to said attorneys were fictitious causes of action in that no employee of a railroad had retained the respondent as a result of sustaining injuries in a railroad accident, and in fact, no accident had occurred. It was alleged that the fictitious nature of the causes of action was known or should have been known to the respondent at the time he received the various advancements from the law firm.

The other counts alleged that the respondent referred other fictitious causes of action to attorney Anthony Di-Grazia, attorney Richard Finn, and attorney Marvin Peters and received money from them. The commissioners found that the respondent was guilty of the charges contained in the other counts and also found respondent guilty of solicitation of personal injury cases, although this charge was not included in the complaint.

The evidence showed that the respondent's first transaction with the firm of Director & Liebenson was typical of the procedure in other cases involving that firm, and it is not necessary in this opinion to give the details of all such transactions. Attorney Liebenson testified that he specialized in the trial of personal injury cases and had known the respondent since about 1949. In December, 1956, the respondent approached the witness and told him that he was so busy handling cases that he didn't have time to try them and wanted to turn some cases over to the witness. On the same day or the following day, the respondent came to Liebenson's office and said that he had a railroad case in which a man named Andrew Fuller had lost both legs in a railroad accident. The respondent told Liebenson that he had been to

Kentucky, where Fuller was in a hospital, and had talked to Fuller and his wife. Respondent further stated that it would take 5 or 6 months before the case could be filed, because if he did not wait until Fuller got out of the hospital he would have to pay Fuller's medical expenses. He told Liebenson that he was experienced in such cases and would handle all of the investigation and bring a completed file to Liebenson and tell him when he could file suit. Respondent claimed that he needed $1200 for investigation expenses. The respondent gave Liebenson a blank form of a contingent fee contract, which purported to be signed by Andrew Fuller and in which Fuller agreed to pay a contingent fee of 33⅓%, together with a letter setting forth the date and place of the accident and the extent of Fuller's injuries. The letter stated that Fuller had retained respondent and that respondent was going to get a letter from Fuller authorizing him to file suit. The letter acknowledged receipt of $1200 and agreed to share the fee with Liebenson on a 50-50 basis. Including the Fuller case, Director & Liebenson paid respondent a total of $11,200 on seven cases. The last transaction of this kind between respondent and Director & Liebenson was in February, 1957. From that week until February, 1958, Liebenson had an average of at least one conversation a week with the respondent pertaining to these cases. In that month, as a result of another case which is not involved here, Liebenson became suspicious as to the cases which respondent had previously referred to him. He wrote to the Interstate Commerce Commission about all of these cases and was advised by the commission that they had no record of any such accidents. Liebenson reported the results of his inquiries to the respondent but the respondent still insisted that all of the cases were *bona fide* cases.

Thereafter, Liebenson had a conversation with the president of the Chicago Bar Association, following which he went to the State's Attorney's office and talked to the first assistant State's Attorney. In May, 1958, respondent and

Liebenson appeared at the State's Attorney's office where they discussed these cases. At that conference, the respondent claimed that all of the cases were genuine cases, even though both the assistant State's Attorney and Liebenson indicated they did not believe him.

The transaction with attorney DiGrazia occurred after the conversation in the State's Attorney's office. In June, 1958, the respondent told DiGrazia that he wanted DiGrazia to become associated with him in a railroad case and told DiGrazia that he was short of money for expenses; the name of the alleged client and some of the details of the alleged accident were stated. DiGrazia gave the respondent $600 in cash and the respondent signed a judgment note in that amount and also gave DiGrazia a memorandum giving the details of the accident and the injuries and a letter agreeing to pay DiGrazia 10% of the fee. The respondent tried to interest DiGrazia in another case at a later date but DiGrazia told the respondent that he had no further funds to advance. At that time DiGrazia asked the respondent how the case was coming and the respondent told him that the case was being investigated and that the respondent was working with an adjuster and hoped to settle the case.

The respondent's transaction with attorney Peters took place in March, 1957, and respondent's conduct was substantially the same as that in the cases involving Director & Liebenson. He told Peters that his client, Charles Hayden, was a dining car porter who had been injured in Ohio on May 13, 1956, and exhibited to Peters a blank employment contract allegedly signed by Hayden. Peters advanced $1500 to the respondent, who delivered to Peters the blank contract and a letter agreeing to give him ⅓ of the fee. Thompson later contacted Peters on two other cases in which a similar arrangement was proposed, but Peters told respondent that he was not interested until the Hayden case materialized.

The respondent's dealing with attorney Finn followed

substantially the same pattern as the DiGrazia matter. On two separate occasions in 1956 Thompson gave Finn a blank employment contract purportedly signed by the injured party and a memorandum stating the details of the alleged accident and injury. On one of these cases attorney Finn gave Thompson $1200 and in the other case he gave him $1500, and in each case took a note from the respondent in those amounts. It was agreed that Finn was to receive ⅔ of the fee in each case. After these transactions, Finn spoke to the respondent on several occasions inquiring as to when the cases would develop, and in July, 1957, Finn took judgments on the notes. He never recovered anything as a result of the judgments.

It was established by the testimony of claim agents of the railroads allegedly involved in these cases that all of the claims which the respondent had referred to the various attorneys were fictitious and nonexistent. In two of the cases in which the New York Central Railroad was allegedly involved it was established that neither the New York Central nor any of its allied or leased lines ran through the towns where the accidents allegedly occurred.

The respondent admitted referring all of these claims to the various attorneys and admitted receiving the money. He stated that all of these cases had been brought to him by one Marshall Buford. The respondent testified that he had represented Buford in 1952 and that commencing in 1954 Buford started bringing him cases. According to the respondent these cases were *bona fide* and in several of them the respondent, or other attorneys to whom respondent referred the cases, recovered substantial amounts from various railroads by settlement or suit. Thompson further testified that Buford was not paid any specific amount for bringing him any specific case and that he was trying to train Buford to be an investigator so that he could earn about $8,000 to $10,000 per year investigating cases for the respondent. However, according to Thompson's own testi-

mony, he never told Buford how to take a statement from an injured party and just told him to get as much information on a case as he could. Respondent testified that Buford never became an expert investigator and that all he did was get information about an accident. The respondent never relied upon Buford and always checked the cases himself. Thompson testified that Buford was never sent out to get cases but that he would bring cases into his office. The respondent further testified that Buford acted ·as an investigator "in part", and the "other part" was that Buford referred the cases to him. In spite of the respondent's own testimony that Buford never was a trained investigator, and that if he were he could only earn $8,000 to $10,000 per year, the respondent's own statements established that in 1956 he paid Buford almost $29,000 and in 1957 he paid him more than $25,000. During the period from 1952 through 1958 the respondent paid Buford a total of nearly $90,000.

The commissioners found that the respondent's own evidence clearly showed that Buford was a runner or chaser for him, rather than an investigator, and that the respondent was guilty of improperly soliciting personal injury cases. As we previously noted, this charge was not made in the complaint but was considered by the commissioners in submitting their recommendation that the respondent be disbarred. The respondent claims that he has been deprived of due process of law in that he was found guilty of conduct with which he had not been charged and that he had not been given an opportunity to defend himself against the charge of solicitation. We agree that the rule in the normal case is that an attorney can be tried only upon the charges in the complaint. (*Cf. In re Eaton,* 14 Ill.2d 338.) However, the circumstances are sufficient to make the usual rule inapplicable. There is nothing in the record to show that the commissioners had any information upon which to base a charge of solicitation at any time prior to the hearing. The

solicitation finding was not made on the basis of any testimony offered by complainant, but was based entirely upon the respondent's own testimony. Under these circumstances, it cannot be said that the respondent was not given an opportunity to defend himself against the charge.

In our opinion the finding that the respondent was guilty of solicitation is amply supported by the record; his own testimony showed that Buford was semi-literate and unskilled; that he never developed into a trained investigator; that respondent never relied on Buford as an investigator; and that Buford never accounted to respondent for money which respondent paid him. In short, this testimony established that Buford did nothing for Thompson except bring him cases, for which Buford was paid almost $90,000 over a 6-year period. In several of the cases involved here it appears that respondent paid Buford as soon as he obtained money from the attorneys. The conclusion is inescapable that this money was paid to Buford to compensate him for bringing cases to the respondent, and not for any investigating services or expenses.

Turning now from a consideration of the solicitation finding, we shall consider the charges in the complaint that the respondent obtained money from the various attorneys by falsely representing to them that he had contracts with certain injured persons. The respondent claims that when he turned the cases over to the attorneys he honestly believed that the cases were genuine and that it was not until February, 1959, that he became convinced that they were not. At that time certain confidence game indictments were returned against respondent involving some of the Liebenson cases. Respondent attempted to subpoena Buford but found that he had left town. He then became convinced that Buford was no good and that some of the contracts Buford had given him were no good. Although the indictments themselves are not relevant here, we feel that in fairness to the respondent, we should point out that in one case respondent

was acquitted and that the remaining indictments were nolle prossed.

Giving the respondent the benefit of every doubt, it is possible that in 1956, when respondent first commenced the conduct involved here, he might have believed that the first two or three cases he referred to the various attorneys were genuine cases, in view of the respondent's testimony that Buford had previously brought him good cases. However, it is inconceivable that this belief could have existed for over two years. During this period the various attorneys were constantly inquiring about the cases and demanding that respondent produce his clients. In spite of these persistent inquiries, respondent never made any real effort to substantiate the existence of the claimants. For example, although some of the alleged injured persons were supposed to be in Chicago hospitals, respondent never tried to verify this information by calling the hospital or going there. He never contacted a doctor on any of the cases. In one of the cases where the claimant was supposedly in a hospital in Kentucky, respondent never contacted the hospital in search of the man. On numerous occasions throughout respondent's testimony he reiterated that he did nothing in any of the cases to verify that they were genuine. His failure to make any such efforts after repeated demands by the attorneys is explainable only by the conclusion that respondent knew the claims were nonexistent and that no verification of them was possible. Furthermore, the evidence shows that in several instances, respondent told the attorneys that he had personally contacted the injured party, or adjusters for the railroads, which was manifestly untrue in view of the now admitted fact that the claimants were fictitious. Although the respondent denied making these statements, the commissioners found as a fact that the testimony of the attorneys was true. The evidence before the commissioners clearly established that the respondent obtained money from the various attorneys by either selling to these attorneys a

share in personal injury cases, or obtaining loans thereon. The evidence also established that the respondent knew that the cases were fictitious.

The respondent claims that there is no proof of fraud and at best the evidence shows that the respondent was guilty of carelessness and mistakes of judgment, and argues that fraud will not be presumed and must be proved by clear and convincing evidence. We agree with the respondent's statements of the law and agree that it is applicable in disciplinary action. (*In re Fisher,* 15 Ill.2d 139, 154.) It is ridiculous, however, to argue that the respondent was guilty of mere carelessness. In our opinion the record furnishes clear and convincing proof that the respondent, in his transactions with the various attorneys, was guilty of fraud. His conduct in these matters was far from being in keeping with the high standards of professional conduct required of attorneys and his actions were such as to bring the legal profession into disrepute. In our opinion the recommendations of the commissioners that the respondent be disbarred from the further practice of law in this State are amply warranted, both upon the charges in the complaint and the solicitation finding. Respondent claims that disbarment is not warranted here because, throughout the respondent's career until the present cases, no client had ever complained of his conduct, and also because the charges were only made by reason of the personal hostility of the attorneys who lost money in their dealings with the respondent. The fact that clients of an attorney have approved of his conduct does not render the attorney immune from disciplinary action in an appropriate case, (*People ex rel. Scholes* v. *Keithley,* 225 Ill. 30, 41), and the motive of the complainant is immaterial. *In re Ashbach,* 13 Ill.2d 411, 418.

The findings and report of the commissioners are approved, and the respondent's name is stricken from the roll of attorneys of this court.

*Respondent disbarred.*